

**SO ORDERED.**

**SIGNED this 13 day of May, 2013.**

_____
**James D. Walker, Jr.
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | CASE NO. 12-51505-JDW |
| TRACY WILLIAMS, | ) | |
| | ) | |
| DEBTOR. | ) | |
| | ) | |
| TRACY WILLIAMS, | ) | ADVERSARY PROCEEDING |
| | ) | NO. 12-5059 |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| AMERICAN EDUCATION SERVICE, | ) | |
| | ) | |
| DEFENDANT, | ) | |
| | ) | |
| EDUCATIONAL CREDIT | ) | |
| MANAGEMENT CORPORATION, | ) | |
| | ) | |
| INTERVENOR-DEFENDANT. | ) | |

BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE

<u>COUNSEL</u>

For Plaintiff:     Tracy Williams, pro se
                   2275 Gray Hwy K2
                   Macon, Georgia 31211

For Defendant:     Thomas W. Joyce
                   Post Office Box 6437
                   Macon, Georgia 31208-6437

**MEMORANDUM OPINION**

This matter comes before the Court on Plaintiff-Debtor's complaint to determine dischargeability of a debt. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

**Findings of Fact**

Plaintiff-Debtor filed a Chapter 7 petition on June 8, 2012, without the assistance of counsel. On June 26, 2012, Debtor filed a complaint to determine dischargeability of her student loan debts to American Education Service. Educational Credit Management Corporation intervened as a defendant because it is the current holder of Debtor's educational loan promissory notes. The Court held a trial on the complaint on January 16, 2013, and March 4, 2013.

The stipulated principal amount of Debtor's student loans is $29,593.92. The loans are educational loans made, insured, or guaranteed by a governmental unit. Debtor testified that she incurred the loans in 1996, 1997 and 2007[1] to study auto mechanics and robotics. She attended schools in Washington and California. Debtor obtained certification as a mechanic and briefly worked in that capacity. However, she testified that the business changed and she could not afford to keep her certification current. For the past 23 years, she has worked as a city bus driver in Tacoma, Washington, and Macon, Georgia.

Debtor testified that her husband made payments on the loans for about one year in 1998

---

[1] This year is probably incorrect, because Debtor consolidated all her loans in 2006.

and 1999. The payments stopped when Debtor and her husband separated. Debtor then obtained deferments for three years, followed by hardship forbearances every year until the present. Because she has kept her loans in abeyance for the majority of the repayment period, Debtor testified that they have never been in default and she has never failed to make a required payment. Defendant was unable to refute this evidence.

Defendant offers a variety of student loan repayment plans, including the standard repayment plan and the income-based repayment plan ("IBR"). Under the standard repayment plan, Debtor's monthly payment would be $185.59 for 240 months. Under the IBR, the amount of Debtor's monthly payment would be calculated based on her adjusted gross income ("AGI")[2] and family size and would be recalculated annually. The IBR program lasts for a maximum of 300 months, at which time any outstanding balance is forgiven.[3] If Debtor were to earn less than 150% of the poverty level for her family size,[4] her IBR payment would be $0. Monthly payments are capped at 15% of the borrower's discretionary income. For purposes of the IBR program, discretionary income is the difference between the borrower's AGI and 150% of the poverty level for a family of the borrower's size. Thus, if Debtor's income were to drop after enrolling in the IBR program, her monthly payment would be reduced accordingly. If she participated in IBR,

---

[2] Debtor testified that her AGI for 2012 was approximately $19,200.

[3] The Court notes that under current federal tax law, any amounts forgiven would be treated as gross income to Debtor. 26 U.S.C. § 61(a)(12). An exception applies if Debtor is insolvent at the time of the forgiveness. Id. § 108(a)(1)(B). The Court further notes that it cannot predict the state of the tax laws or Debtor's net worth 25 years from now.

[4] The poverty level is determined and published by the U.S. Department of Health and Human Services. In 2012, the poverty level of a one-person household was $11,170; the poverty level for a two-person household was $15,130.

Debtor would remain eligible for forbearances and deferments. Debtor stipulated that she is qualified and eligible for the IBR program, but has not applied for it.

In May 2010, while living in Tacoma and driving buses for Pierce Transit, Debtor was diagnosed with a growth in her eye that could not be removed until it matured, which was expected to take about two years. The following month, in June 2010, Debtor moved to Macon because she had relatives living in the area. During the 16-month period before her eye was ready for surgery, her income consisted of unemployment benefits or workers' compensation. Debtor underwent surgery to remove the growth on her eye in September of 2011. She began working as a driver for Macon-Bibb County Transit Authority ("MTA") in March of 2012. She works 40 hours per week and earns $10.11 per hour. Although she has received overtime income in the past, Debtor testified MTA no longer allows its employees to work overtime.

During the trial, the parties agreed that Debtor takes home $712 every two weeks from her job with MTA,[5] which amounts to $1,542 per month. In addition, Debtor is financially responsible for her 27-year-old son, Joseph, who cannot work because he suffers from an anxiety disorder with paranoia and engages in self-mutilation. At the time of the trial, Joseph lived with Debtor. On August 15, 2012–two months after Debtor filed her bankruptcy petition–Joseph was awarded SSI disability income in the amount of $465.34 per month and a lump-sum back

---

[5] Debtor testified that her take-home pay is $712 per week. She also testified that she no longer receives overtime. Defendant's exhibit 8 includes a copy of Debtor's October 5, 2012, earnings statement. The earnings statement shows regular earnings of $808.80 and overtime earnings of $142.85, for total gross earnings of $951.65. After taxes and other deductions, the net earnings equaled $712.44. Thus, approximately 15% of the $712 figure asserted by both Defendant and Debtor appears to consist of overtime income. Without the overtime, the Court estimates Debtor would take home approximately $605.20 every two weeks, which amounts to $1,311 per month.

payment in the amount of $13,112.92 to be paid in three installments every six months. The monthly SSI payments increase Debtor's total monthly income to $2,007. Debtor testified that she is required to use the lump-sum award solely for her son's benefit and must document all expenditures of the money. During the March 4, 2013, trial date, Debtor reported that Joseph will be moving into an apartment at a River Edge Behavioral Health Center. His monthly disability check will cover the costs of housing, which includes cable, and medicine. However, Debtor must pay all other utilities.

Debtor's approximate expenses, other than student loan payments, as reported on her Schedule J and supplemented by her responses to Defendant's discovery requests and her trial testimony are approximately as follows:[6]

- Rent: $565
- Utilities: $250 (including $100 for cable)
- Food: $400
- Clothing: $100
- Laundry: $50
- Medical: $95
- Transportation: $100
- Life insurance: $30
- Auto insurance: $104
- Car payment: $260[7]

These expenses, which include Joseph's expenses, total $1,954. When compared to her

---

[6] On Schedule I, Debtor listed average monthly income of $1,509. On Schedule J, she listed expenses of $1,529, resulting in a net monthly income of -$29.00.

[7] Debtor testified to her car payment during the trial. She did not list a vehicle on Schedule B, nor did she list a car loan on Schedule D. She did file a statement of intention to reaffirm a debt to "UNITED ACCEPT," secured by "AUTO." (Case No. 12-51505, docket no. 5.) The Court has no evidence about the vehicle (make, model, age, mileage, etc.) or the loan (date, term, original amount, balance remaining, etc.).

monthly income of $2,007, Debtor is left with a surplus of $53.[8] To the extent the expenses are paid for Joseph's benefit, they can be offset by his lump-sum disability award and by his move to River Edge. While the move will reduce Debtor's expenses, she will also lose the benefit of Joseph's $465 in monthly disability payments.

Debtor testified that income from her job may also be at risk in the future. Debtor's certification to drive for the MTA expires in March of 2014. To obtain renewal of her certification, Debtor believes her corrected eyesight must be no worse than 20/40 in at least one eye. Based on a recent eye examination, Debtor believes her vision is 25/30 in one eye and 25/25 in the other eye. Therefore, Debtor believes she will no longer qualify to work as a driver and will have to seek new employment. Debtor testified that she has begun looking for work, and she does not believe she will find a job that pays an amount equal to or greater than her current wage. She testified that she considered looking for work as a mechanic. But, at 49 years old, her age and her gender would be impediments to obtaining such employment.

As noted earlier, Debtor is eligible for the IBR program under which monthly loan payments are calculated based on AGI and household size. According to tax returns submitted into evidence, Debtor's AGI in 2007 was $27,071; her AGI in 2008 was $44,616; her AGI in 2009 was $50,745; her AGI in 2010 was $23,400, and her AGI in 2011 was $29,120. The parties stipulated that based on her 2011 AGI and a household size of two, her monthly payments under the IBR program would be $33.48.

Debtor testified her AGI for 2012 was approximately $19,200. Assuming she can

---

[8] The Court has calculated take home pay, less overtime, as $1,311. See note 5. Adding the disability payments, the income increases to $1,776.

continue to claim a household of two after Joseph moves to River Edge,[9] her payment under the IBR program would be $0.[10] If she has a household size of one, her payment under the IBR program would be $30.66.[11]

## Conclusions of Law

Debtor received a Chapter 7 discharge on October 15, 2012. The discharge relieved her of personal liability for all prepetition debts except as provided in § 523 of the Bankruptcy Code. 11 U.S.C. § 727(b). Pursuant to § 523(a)(8), the discharge does not apply to qualified student loans unless the exception to discharge "would impose an undue hardship on the debtor and the debtor's dependents[.]" Id. § 523(a)(8).

The Eleventh Circuit has adopted the three-prong Brunner test for determining whether repayment of student loans will impose an undue hardship:

> (1) ... the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) ... additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) ... the debtor has made good faith efforts to repay the loans.

Hemar Ins. Corp. v. Cox (In re Cox), 338 F.3d 1238, 1241 (11th Cir. 2003) (quoting Brunner v. New York State Higher Educ. Servs. Corp.), 831 F.2d 395, 396 (2d Cir. 1987)). The burden is on

---

[9] Counsel for Defendant suggested without elaboration that if Debtor can continue to claim her son as a dependent, she will continue to have a household size of two for purposes of the IBR program.

[10] $19,200 (AGI) less $22,695 (150% of poverty level) results in $0 discretionary income.

[11] $19,200 (AGI) less $16,755 (150% of poverty level) equals $2,445 in annual discretionary income. Fifteen percent of discretionary income is $366.75 per year, or $30.56 per month.

Debtor to prove each prong of the Brunner test by a preponderance of the evidence. Douglas v. Educational Credit Mgmt. Corp. (In re Douglas), 366 B.R. 241, 252 (Bankr. M.D. Ga. 2007).

Brunner requires more than a mere present inability to repay student loans; instead, the debtor must demonstrate a "'certainty of hopelessness' that the debtor will be able to repay the loans within the repayment period[.]" Educational Credit Mgmt. Corp. v. Mosley (In re Mosley), 494 F.3d 1320, 1326 (11th Cir. 2007) (quoting Brightful v. Pennsylvania Higher Educ. Assistance Agency, 267 F.3d 324, 328 (3d Cir. 2001)). This results in a high standard such that a discharge of student loans may be obtained only in "the most dire circumstances." Educational Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393, 399 (4th Cir. 2005). As the court in Cox explained:

> The government is not twisting the arms of potential students. The decision of whether or not to borrow for a college education lies with the individual; absent an expression to the contrary, the government does not guarantee the student's future financial success. If the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow.

338 F.3d at 1242 (quoting In re Roberson, 999 F.2d 1132, 1137 (7th Cir. 1993)).

**1. Minimal Standard of Living.** The first prong of the Brunner test requires Debtor to show that, if required to repay her loans, she cannot maintain a minimal standard of living for herself and her dependents. A minimal standard of living has been defined as a "measure of comfort, supported by a level of income, sufficient to pay the costs of specific items recognized by both subjective and objective criteria as basic necessities." Ivory v. United States Dept. of Educ. (In re Ivory), 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001). These necessities include shelter, basic utilities, food, personal hygiene products, transportation, medical services, and

9

entertainment or recreation. Id.; Douglas, 366 B.R. at 253.

Debtor's monthly income with overtime and her son's disability payments is $2,007. Debtor's monthly expenses total $1,954: $565 for rent; $250 for utilities, including cable; $400 for food; $150 for clothing and laundry; $95 for medical; $100 for transportation; $30 for life insurance; $104 for auto insurance; and $260 for car payment. The Court finds these expenses to be reasonable and necessary. They demonstrate that Debtor is providing only for her bare necessities, without any lavish or excessive spending. Based on these figures, Debtor has a net monthly surplus of $53.

Because some of the expenses are attributable to Joseph and can, therefore, be satisfied from his lump-sum disability award, Debtor's actual expenses are lower than listed. However, when Joseph moves to River Edge–which will also reduce Debtor's outlays for Joseph's living expenses–Debtor will lose the benefit of his monthly disability payment. Assuming Joseph accounts for approximately half of non-fixed expenses (food, clothing, laundry, utilities, and medical), Debtor's expenses will decrease to $1,511. Without her son's disability payments, her income will drop to $1,542. Without overtime, her income will further drop to approximately $1,311, resulting in a monthly deficit of $200. Based on these figures, even without making any payments on her student loans, Debtor will be unable to maintain a minimal standard of living.[12]

---

[12] Some courts look to the debtor's potential IBR payment rather than the standard loan payment when analyzing prong one of the Brunner test. In Ulm v. Educational Credit Management Corporation, 304 B.R. 915 (S.D. Ga. 2004), the court said the prong-one analysis should take into account "that an option is available to [the debtor] that could provide for adjustment of her student loan payments in accordance with her annual income[.]" Id. at 920. In Educational Credit Management Corporation v. Boykin (In re Boykin), 313 B.R. 516 (M.D. Ga. 2004), the court found it relevant to prong one that the debtors' "payments will not rise above a predetermined level because of the alternative payment plans offered in the Ford program[.]" Id. at 522. See also, Educational Credit Mgmt. Corp. v. Beattie, No. C12-59, 2012 WL 7991802, at

Therefore, the Court concludes that Debtor has proven the first prong of the Brunner test by a preponderance of the evidence. See Bush v. United States Dept. of Educ. (In re Bush), 450 B.R. 235, 241 (Bankr. M.D. Ga. 2011) (where the debtor's basic expenses exceeded her income, she satisfied the first prong of Brunner).

**2. Additional Circumstances.** The second prong of the Brunner test requires Debtor to show the existence of additional circumstances that indicate this state of affairs–inability to maintain a minimal standard of living if required to pay the student loans–is likely to persist for a significant portion of the repayment period of the student loans. This prong "most clearly reflects the congressional imperative that the debtor's hardship must be more than the normal hardship that accompanies bankruptcy." Frushour, 433 F.3d at 401. The additional circumstances should indicate more than "a present inability to fulfill a financial commitment," but should demonstrate a "certainty of hopelessness" in the future, as well. Educational Credit Mgmt. Corp. v. Carter (In re Carter), 279 B.R. 872, 877 (M.D. Ga. 2002) (quoting Roberson, 999 F.2d at 1136) (internal quotation marks omitted). Debtor may satisfy prong by showing a "total incapacity" to pay her debts in the future for reasons beyond her control, id. (quoting In re Mallinckrodt, 274 B.R. 560, 566-67 (S.D. Fla. 2002)), or by demonstrating "the presence of 'unique' or 'extraordinary' circumstances which would render it unlikely that the debtor would be able to honor his obligations." Ulm v. Educational Credit Mgmt. Corp. (In re Ulm), 304 B.R. 915, 921 (S.D. Ga.

---

*4 (W.D. Wash. Dec. 17, 2012) (the debtor's payment under the IBR was the correct rate to use when analyzing prong one of the Brunner test); Kuznicki v. Educational Credit Mgmt. Corp. (In re Kuznicki), 483 B.R. 296, 301 (W.D. Pa. 2012) (same). Compare Braun v. Sallie Mae (In re Braun), No. 1.10-BK-11169, Adv. No. 11-01529, 2012 WL 5199163, at *6 (Bankr. E.D. Va. 2012) (declining to take into account the fact that the debtor's payments would be $0 under the IBR for purposes of prong one). In this case, Debtor satisfies prong one regardless of whether the Court uses the standard repayment amount or the IBR repayment amount.

2004) (quoting Ballard v. Virginia (In re Ballard), 60 B.R. 673, 675 (Bankr. W.D. Va. 1986));

Educational Credit Mgmt. Corp. v. Boykin (In re Boykin), 313 B.R. 516, 522 (M.D. Ga. 2004).

Such circumstances are not limited to a serious illness or disability. Douglas, 366 B.R. at 256.

The court may also consider factors such as "the debtor's age, age of the debtor's dependents, debtor's education, work and income history, physical and mental health, and other relevant circumstances." Id. Nevertheless, satisfying prong two "is not an easy task for a debtor." Id.

The Eleventh Circuit has not provided clear guidance on applying prong two other than to embrace the "certainty of hopelessness" standard. Mosley, 494 F.3d at 1326. In Mosley, the court found the evidence satisfied this standard where the following circumstances were present:

> [The debtor] testified that his depression and chronic back pain have frustrated his efforts to work, and thus his ability to repay his loans, as well as to provide himself with shelter, food, and transportation, for several years. ... He testified that his back problems preclude him from heavy lifting, which rules out most of the jobs available in the labor pool from which he seeks work. Exacerbating the problem, his medications make it difficult for him to function. He did not finish college and has been unable to complete the training necessary to learn a trade. [The debtor] relies on public assistance programs for health care and food .... [The debtor's] evidence of medical problems, lack of skills, and dire living conditions support the bankruptcy court's finding that it is highly unlikely he will become able to repay his loans.

Id. at 1326-27.

In reaching its conclusion, the Eleventh Circuit cited the Ninth Circuit's decision in Educational Credit Management Corporation v. Nys (In re Nys), 446 F.3d 938 (9th Cir. 2006). Mosley, 494 F.3d at 1327. In Nys, Ninth Circuit held that "'[u]ndue hardship' does not require an exceptional circumstance beyond the inability to pay now and for a substantial portion of the loan's repayment period." Id. at 941. The debtor in Nys incurred her loans to study drafting

12

technology and was employed as a drafting technician with an adjusted gross income of $36,981.74, which represented the maximum amount she was likely to ever earn in her field. At the time of the case, the debtor was 51 years old, lived in a house in need of extensive repairs, and owed $85,000 in student loans. The debtor had a monthly income of $2,299 and monthly expenses of $2,295. Id. at 942-43. The bankruptcy court denied discharge of the student loans. Id. at 943. Although the bankruptcy court found the debtor would be financially unable to pay her student loans in the foreseeable future, it also found she failed to demonstrate the "exceptional circumstances" necessary to satisfy prong two of Brunner. Id. The Bankruptcy Appellate Panel reversed, and the Court of Appeals affirmed the BAP. Id.

     The Ninth Circuit noted that the legislative history of § 523(a)(8) played a significant role in the development of the Brunner test because the term "undue hardship" is undefined. Id. The phrase "undue hardship" was lifted from a proposed bill by the Commission on the Bankruptcy Laws of the United States. Therefore, the court in Brunner relied on the Commission's report as a source of legislative intent, which the court evaluated as follows:

> The Commission recognized that there was a high incidence of students filing for bankruptcy after finishing their education. ...
> This "rising incidence" contravened the general policy that "a loan ... that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt."
> ...
> By requiring a showing of undue hardship, the Commission envisioned a determination of whether the amount and reliability of income and

13

> other wealth which the debtor could reasonably be expected to receive in the future could maintain the debtor and his or her dependents at a minimal standard of living as well as pay off the student loans.
> ...
> Therefore, Congress sought to prohibit a "garden-variety debtor" from discharging student loans, especially when that "garden-variety debtor" will presumably use her loan-funded education to substantially increase her income in the near future. ... <u>What separates a "garden-variety debtor" from a debtor who can show "undue hardship" is the realistic possibility that a "garden-variety debtor" could improve her financial situation in the future.</u> With increased financial stability, a debtor can make payments on her student loans and maintain a minimal standard of living. In comparison, forcing debtors who cannot reasonably be expected to increase their future income to make payments on their student loans when it causes them to fall below a minimal standard of living constitutes an "undue hardship."

<u>Id.</u> at 944 (quoting <u>Brunner</u>, 831 F.2d at 754; Report of the Comm'n on the Bankr. Laws of the United States, H.R. Doc. No. 93-137, at 140-41 (1973)) (internal citations omitted) (emphasis added). Based on this analysis, the Ninth Circuit concluded the "additional circumstances" required by <u>Brunner</u> "'need be "exceptional" only in the sense that they demonstrate insurmountable barriers to the debtors' financial recovery and ability to pay.'" <u>Id.</u> at 946 (quoting <u>Nys v. Educational Credit Mgmt. Corp.</u> (<u>In re Nys</u>), 308 B.R. 436, 444 (BAP 9th Cir. 2004)). By contrast, two Georgia district courts have cited the need for exceptional and unique circumstances. <u>Ulm</u>, 304 B.R. at 921; <u>Boykin</u>, 313 B.R. at 522.[13]

From Debtor's evidence, the Court has identified two "additional circumstances" that may be relevant to the prong-two analysis: (1) the special needs of Debtor's son, and (2) Debtor's

---

[13] In both cases, the district court reversed my decision to discharge the student loans. See <u>Ulm</u>, No. 99-40282, Adv. No. 2-4124 (Bankr. S.D. Ga. June 5, 2003) (Walker, J.); <u>Boykin</u>, 312 B.R. 915 (Bankr. M.D. Ga. 2004) (Walker, J.).

14

vision and its effect on her long-term employment prospects.

Debtor's son has undoubtedly been a drain on her resources. However, his circumstances are improving. Not only has he been awarded monthly disability payments and a lump-sum back payment, he is moving out of Debtor's apartment to a facility that can provide him with appropriate care. While the move will cause Debtor to lose the benefit of his disability income, she will also see a decrease in her living expenses. Thus, her responsibilities to her son will not prevent her from improving her financial circumstances in the future. Debtor can also expect her expenses to decrease by $260 when she pays off her car loan. Although the Court does not have evidence as to the length of the loan, vehicle loans rarely exceed a term of 72 months, which is significantly shorter than the student loan repayment period.

On the income side of Debtor's financial circumstances, her vision is an issue. She testified that she believes her vision is only correctable to 25/25 in one eye and 25/30 in the other eye. She further testified that state and federal regulations require bus drivers to have vision of at least 20/40 in one eye.[14] Although her certification to drive remains valid until March 2014, Debtor believes that she will be unable to continue driving after that time and further believes it would be dangerous for her to do so.

While Debtor's testimony may be sufficient to demonstrate that she will be unable to continue working for MTA after March of 2014, it does not demonstrate that she will be unable

---

[14] See 49 CFR § 391.41(b)(10) (requiring "visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses[.]"); Commercial Driver's License Rules of the Georgia Department of Driver Services 1-1-.04 (requiring compliance with 49 CFR § 391.41 for Georgia commercial driver's licenses and allowing a driver to satisfy the vision requirement by meeting the 20/40 standard in at least one eye), *available online at* www.dds.ga.gov/commercial/rules.aspx.

to work in any capacity. In other words, it is not an "insurmountable barrier" to financial recovery that creates a "certainty of hopelessness" for her future. Debtor offered little evidence about her future job prospects. She testified that based on a preliminary job search she has concluded she is unlikely to find replacement work at the wages she currently earns. However, she did not describe the type of jobs she has considered, their starting wages, or their potential for advancement or regular wage increases. Furthermore, prong two of Brunner requires more than a speculative decline in income. See Frushour, 433 F.3d at 402 (a contention "founded on little more than speculation ... cannot satisfy [the debtor's] burden to prove the second Brunner factor by a preponderance of the evidence."). Although Debtor's employment prospects are likely limited due to her age and obsolete education, she has demonstrated an ability to shift careers from mechanics to bus driving. She has further demonstrated an ability to maintain steady employment for the past 23 years, interrupted only by the need for eye surgery. For these reasons, as well as her anticipated decrease in expenses, the Courts finds Debtor failed to carry her burden to prove additional circumstances likely to persist for the duration of the loan repayment period. See Boykin, 313 B.R. at 522-23 (debtors' lack of college degrees, lack of marketable skills above minimum-wage level, two children, and various health problems were not the type of "unique" or "extraordinary" circumstances that would satisfy prong two of the Brunner test).[15]

---

[15] Cases in which the debtor failed to prove prong two of the Brunner test: Vuini v. Zions Bank (In re Vuini), No. 6:11-bk-7559; Adv. No. 6:11-ap-227, 2012 WL 5554406 (Bankr. M.D. Fla. Nov. 14, 2012) (debtor worked part time at Disney World for $9.50 per hour and made no attempt to find better employment; debtor graduated from law school; failed the bar exam; had a child with multiple health problems that interfered with her ability to work full time; had carpal tunnel syndrome, which prevented her from working at a computer full time; was certified to teach; and could qualify as a paralegal); Clark v. Texas Guaranteed Student Loan Corp. (In re Clark), 465 B.R. 896 (Bankr. N.D. Ala. 2012) (37-year-old debtor was trained as an engineer but was unable to find work in that field over a 5-year period due to a felony conviction; the court

**3. Good-Faith Repayment Efforts.** The third prong of the Brunner test requires Debtor to show good-faith efforts to repay her student loans. "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses; his default should result, not from his choices, but from factors beyond his reasonable control." Mosley, 494 F.3d at 1327. While efforts to negotiate a payment plan are evidence of good faith, failure to participate in an income-based repayment program does not per se establish lack of good faith effort to repay the student loans. Id. In Krieger v. Educational Credit Management Corporation, No. 12-3592, 2013 WL 1442305 (7th Cir. April 10, 2013), the bankruptcy court granted a discharge of student loans even though the debtor had not participated in the IBR or similar program. Id. at *1. The district court reversed, concluding that failure to participate in such a program demonstrated a

---

found he likely could find work in other areas); Spence v. Educational Credit Mgmt. Corp. (In re Spence), 541 F.3d 538 (4th Cir. 2008) (debtor was in her late 60s with a low-paying job and age-related health problems, she also had advanced degrees, a strong work history, and had not recently sought a higher-paying position); Brightful v. Pennsylvania Higher Educ. Assistance. Agency (In re Brightful), 267 F.3d 324 (3d Cir. 2001) (debtor was a 43-year-old, single mother with some college but no degree; she had worked as a legal secretary for more than a decade; she had emotional and mental problems that culminated in two suicide attempts but did not impair her ability to work).

Cases in which the debtor proved prong two of the Brunner test: Fields v. Educational Credit Mgmt. Corp. (In re Fields), No. 10-71051, Adv. No. 10-70021, 2012 WL 3235844 (Bankr. N.D. Ala. March 23, 2012) (debtor was well educated and had a solid work history, but had no steady employment in four years due to a "schizophrenic delusional, paranoid and psychotic disorder" that interfered with his ability to work); Champagne v. Educational Credit Mgmt. Corp. (In re Champagne), No. 6:10-bk-14228, Adv. No. 10-ap-285, 2012 WL 293736 (Bankr. M.D. Fla. Jan. 12, 2012) (debtor held a degree in economics, but suffered from HIV, severe depression, anxiety, attention deficit disorder, and alcoholism; he also had a misdemeanor DUI conviction, had been homeless for eight years, and had been employed sporadically for the past 10 years); Krieger v. Educational Credit Mgmt. Corp., No. 12-35922013 WL 1442305 (7th Cir. April 10, 2013) (debtor lived in a rural area with few employment prospects; she lived with her elderly mother, with whom she shared an income of a few hundred dollars; she was too poor to move in search for better job prospects; she had applied for more than 200 jobs; she lacked internet and drove an old car in need of repairs).

lack of good-faith effort to repay the loans. Id. The circuit court disagreed with the district court. Id. at *2.

> [The district] judge concluded good faith entails commitment to future efforts to repay. Yet, if this is so, no educational loan *ever* could be discharged, because it is always possible to pay in the future should prospects improve. Section 523(a)(8) does not forbid discharge, however[.] ... The statutory language is that a discharge is possible when payment would cause an "undue hardship." It is important not to allow judicial glosses, such as the language in Roberson [999 F.2d 1123 (7th Cir. 1993)] and Brunner, to supersede the statute itself.

Id. (emphasis in original).

Debtor acknowledges her eligibility for the IBR program, but has failed to apply for it. In the circumstances of this case, such failure does not show lack of good faith. The evidence is unrefuted that Debtor made regular payments on her student loans for the first year during which payments were due. Since that time, no payments have come due because the loans have been in an uninterrupted state of either forbearance or deferral. Defendant cited Educational Credit Management Corporation v. Mosko (In re Mosko), 515 F.3d 319 (4th Cir. 2008), for the proposition that the simple act of obtaining a forbearance or deferment does not demonstrate a good faith effort to repay student loans if Debtor had money available to pay her loans while they were in abeyance. In Mosko, the court said, "without reasonable efforts to make subsequent payments, requesting deferments and forbearances alone does not establish good faith." Id. at 327. By Defendant's logic, even enrollment in the IBR program would fail to show good-faith repayment efforts if the debtor had *any* funds available in excess of the amount of required IBR payments. The Court simply does not find such an argument persuasive. A debtor who has made some payments on her loans and who otherwise attempts to deal with the loans through some, if

not all, of the means made available by the lender, demonstrates a good-faith effort to repay her loans.

**Conclusion**

The Court is persuaded that the ever-present specter of student loan liability creates a "hardship" for Debtor in the general sense of the term. However, she has failed to carry her burden to prove it creates an "undue hardship" as defined under the <u>Brunner</u> test. Debtor's efforts to keep her loans out of default, by making payments when she could afford to do so and otherwise obtaining forbearances and deferrals demonstrate a good-faith effort to repay the loans. In her current circumstances, if Debtor is required to make any student loan payments, she will not be able to maintain a minimal standard of living. However, she has not shown additional circumstances that make it likely her current situation will persist for the next 25 years. On the contrary, Debtor has shown she is capable of obtaining and maintaining steady employment. Although she may have to change professions, she apparently has done so in the past with some success, when she made the transition from mechanic to bus driver.

Because Debtor failed to prove the second prong of the <u>Brunner</u> test, the Court concludes her student loans are nondischargeable and will enter judgment for Defendant.

An Order in accordance with this Opinion will be entered on this date.


END OF DOCUMENT